VICENTE ZAYAS PIZARRO, demandante y apelante, *v.* LA SUCESIÓN DE CAYETANO DALECCIO Y VITA Y OTROS, demandados y apelados.

Número 10572.
*Sometido:* 30 de junio de 1957. *Resuelto:* 22 de noviembre de 1957.

*Vicente Zayas Pizarro, pro se* y *R. Hernández Matos,* abogados del apelante; *Carlos E. Colón,* abogado de los apelados.

El Juez Asociado Señor Belaval emitió la opinión del Tribunal.

EN RECONSIDERACIÓN

Se trata de una declaratoria de servidumbre de paso, en beneficio de una finca con camino de uso público, existente, pero que alega el demandante y apelante, no resulta seguro y practicable y no resulta suficiente para las necesidades del fundo.   La ilustrada Sala sentenciadora, entre otras, llegó a las siguientes conclusiones de hecho:

"Que hay un camino que cruza la finca de los demandados *hasta el punto donde la misma colinda con la del demandante en una casita,* siguiendo dicho camino hacia arriba *bordeando la finca del demandante* por la parte norte (debe decir Este) de la misma (conclusión A) ; que el camino es de doscientos noventa metros de largo por tres metros sesenta centímetros de ancho con zanja de veinte pulgadas de ancho en algunos sitios, y en otros de tres metros setenta y cinco centímetros, en otros de cinco metros setenta centímetros y a veces cuatro metros diez centímetros, por lo que resulta irregular dependiendo ello de las curvas y por falta de desmonte en partes del camino que está bordeado por la montaña, (conclusión B) ; que el camino aun cuando es empinado y no está afirmado o asfaltado, es *susceptible de ensancharse y mejorarse,* (conclusión C) ; que a pesar del estado actual del camino por el mismo pueden transitar vehículos pesados de motor con carga y sin ella, (conclusión D) ; que la finca del demandante se extiende desde donde colinda con el camino a que venimos haciendo referencia, *en dirección al suroeste donde hay yacimientos de piedra,* propia para construcciones y otros fines, (conclusión G) ; que ya en la finca del demandante y en dirección a los yacimientos de piedra el terreno es quebrado, rocoso y de grandes hondonadas, (conclusión I) ; *que en la finca del demandante no hay caminos propiamente dicho,* pero sí veredas, caminos de a pie y de herradura, (conclusión J) ; que según declara el propio demandante señor Vicente Zayas Pizarro en su finca no existen los caminos para subir al camino que bordea la misma y da salida a la carretera, y que el costo de construcción sería muy gravoso y elevado, *pero que podría construirse,* aunque a un gasto exorbitante, según el resto de la prueba, (conclusión M) ; *que el*

*camino que hoy existe necesita reparación* y es susceptible de la misma, (conclusión O) ; *que ensanchando el camino* y afirmándolo o empedrándolo, o pavimentándolo sería propio ya que conservándolo se evitaría el que el mismo se dañara por lluvias, (conclusión P) ; que a pesar de su estado actual por el mismo se puede transitar con seguridad, *tomando desde luego las precauciones necesarias a un terreno accidentado y a un camino angosto,* (conclusión Q) ; que siendo susceptible de arreglo y reparación *el camino existente que enlaza la carretera insular del Naranjo con la finca del demandante* y pudiendo construirse un camino que enlace los yacimientos de piedra con el camino que va de la finca del demandante a la carretera, *aun cuando éste resulte a un precio exorbitante y excesivo*—se desprende del resto de la prueba—no procede se conceda la servidumbre de paso solicitada, (conclusión R) ; que aun cuando el costo del camino *para enlazar el ya existente* con los yacimientos de piedra *sea excesivo y gravoso para el demandante* el mismo es dentro y por los terrenos de la finca del demandante, (conclusión S) ; que según declaración de testigos, el camino entre los yacimientos de piedra y el que conecta la finca del demandante con la carretera insular, *implicaría una obra muy costosa,* pero no por ello imposible dentro de la técnica de construcciones existentes."

Las conclusiones de la ilustrada Sala sentenciadora serían del todo completas, si también hubiera formulado, que el costo de la reparación del camino de uso público existente entre la carretera insular y el extremo sureste de la finca del demandante que es donde está la casita, sería también demasiado costoso para el demandante y apelante, según fué declarado por el perito señor Giles, quien además declaró que habría que buscar otro tendido con el fin de evitar las dos pendientes inclinadas que tiene dicho camino por tener dichas pendientes una inclinación de un veinte por ciento (veinte metros de elevación por cada cien metros), aunque los otros dos peritos declaran que la inclinación es de un dieciséis o un diecisiete por ciento y la inclinación normal máxima es de un siete por ciento.

Una demostración gráfica aproximada de los hechos declarados como probados sería la siguiente:

Es conveniente anotar, que en cuanto al camino de uso público existente, la ilustrada Sala sentenciadora no concluye de una manera clara y precisa que el camino vecinal existente sea práctico y seguro, como lo exige la ley y la jurisprudencia aplicable al caso, sino que determina cierto grado de accesibilidad, "tomando desde luego, las precauciones necesarias a un terreno accidentado y a un camino angosto" que puede ser reparado para cubrir las necesidades del fundo. Esto nos ha obligado a realizar por nuestra parte, una prolija comprobación de la prueba que tuvo ante

sí la ilustrada Sala sentenciadora, a los efectos de fijar el verdadero alcance y el correcto sentido de dicha conclusión. Descartando aquella parte de los testimonios donde pudieran estar en conflicto, tanto los elementos de la pura demostración del hecho como los elementos de la credibilidad y contrastando los puntos conflictivos con las exposiciones más desinteresadas de la prueba científica que tuvo ante sí la ilustrada Sala sentenciadora, tales como el plano topográfico de la región y el plano de elevación del camino público con el cual empalma el camino vecinal, preparados por los ingenieros del anterior Departamento del Interior, los planos de mensura de las dos fincas concernidas, preparados por dos agrimensores independientes para otros fines que no fueron los de este litigio, no tenemos más remedio que interpretar dicha conclusión, en el sentido, que la ilustrada Sala sentenciadora concluyó, como cuestión de hecho, que aunque el camino vecinal existente que bordea el extremo sureste de la finca del demandante y apelante, tiene cierto grado de accesibilidad que permite que por él transiten o puedan transitar ocasionalmente vehículos pesados de motor, para convertirse en un camino práctico y seguro, suficiente además para las necesidades del fundo necesitaría de ciertas reparaciones, tales como desmonte, ensanche, asfaltado o pavimentación, cuyas reparaciones debía sufragar el demandante y apelante. Veamos:

El primer testigo en declarar sobre la condición actual del camino de uso público existente, presentado por el demandante y apelante, fué el ingeniero civil señor Giles, quien declaró en los siguientes términos: "como todos los caminos de la altura y de montes, hecho por el tráfico (tránsito) precisamente y por la lluvia, algún trabajo quizás de pala y pico, es un camino con mucha pendiente", (Giles t. 37–38); "un camino vecinal de mucha pendiente, una superficie muy mala e inconveniente . . . quiero decir que no es un camino adecuado para el tráfico de vehículos, excepto en lo que es

carros de bueyes y con dificultad un *jeep* podría subir no sé, en tiempo seco probablemente y en tiempo de lluvia, dudo que pueda subir", (Giles t. 49–50), "el ancho de cuatro a cinco metros, no es muy exacto, tiene cercas a ambos lados" . . . "para aclarar mejor, en varias partes, el camino es una especie de zanjón, quiero decir que con el tráfico se ha hecho una zanja en la cerca hasta arriba, hay una inclinación y el camino, o sea, el piso del camino está en algunos sitios tres y cuatro pies más bajo que la tierra al lado", (Giles t. 50–51); "subí en un Ford hasta la terminación de la carretera" y de allí en adelante "a pie"; la distancia desde la terminación del camino hasta la finca del demandante y apelante, sería "de unos 300 metros aproximadamente" . . . "hay dos secciones cortas que tendrían alrededor de veinte por ciento de pendiente" . . . Si tuviera que traficar por ese camino con *trucks* para la explotación de una cantera de mármol o piedra, "pues renunciaría" . . . "porque no quiero tráfico por allí . . . porque hay mucha pendiente, hay mucha pendiente y habría peligro" . . . "no es seguro" . . . "creo que no sería práctico", (Giles t. 51–54); cuando llega a la finca del demandante y apelante, a la izquierda, (sureste) sube el terreno . . . "el camino está más o menos en la parte más alta de la cuchilla que va subiendo", (Giles t. 56); en cuanto a la servidumbre solicitada, "desde la terminación de la carretera se puede seguir un camino sin pendiente que es casi al nivel y se llegaría al punto mediano de la colindancia sur" . . . "un camino que tendrá al llegar a la colindancia exactamente la misma altura que tiene la terminación de la carretera" . . . (Giles t. 58); un camino que se hiciera dentro de la finca, para ir desde la casita (extremo sureste) hasta la parte suroeste (donde está la boca de la cantera) tendría una pendiente "bastante fuerte" . . . "al lado de la colindancia . . . cerca al sur la pendiente será bien fuerte . . . la parte más llana es "la esquina suroeste", (Giles t. 67–69); para

arreglar el camino de uso público existente "precisamente en este trayecto de trescientos metros más o menos, es donde si yo fuera encargado de hacer un camino para llegar a la finca buscaría hacer unos variantes para mejor" . . . "por el mismo sitio . . . se puede hacer si se puede gastar mucho dinero pero sería muy costoso" . . . no justificaría la explotación de "ni la finca esa ni otras más", (Giles t. 73–74) ; "yo he dicho que para un *jeep* supongo que se pueda subir en muchas ocasiones . . . pero en un automóvil yo no me atrevería a subir nunca por ese camino", (Giles t. 85) ; "la carretera viene subiendo continuamente de altura menor a altura mayor" . . . "para hacerlo factible" como si fuera una carretera pública . . . sería bastante costoso . . . para hacerlo factible como los de la Central Merceditas donde caben dos *trucks* grandes y lo estiban bien, "sería muy costoso y habría que buscar variantes para aminorar" . . . con el trazado que tiene "muy costoso" . . . para hacerlo transitable en tiempos ordinarios, lo que se llama "odd-weather" . . . para hacerlo transitable *como mero camino vecinal,* "no sería muy costoso, se puede transitar ahora, *pero no con* vehículos" . . . suponiendo que el mismo camino lo asfaltaran . . . "sería muy peligroso" . . . "no es practicable ni seguro", (Giles t. 85–89).

El segundo testigo en declarar sobre la condición actual del camino de uso público existente, presentado por el demandante y apelante, fué el ingeniero civil señor Nazario, quien declaró en los siguientes términos: desde la terminación del camino del Naranjo (carretera) hasta la finca del señor Zayas Pizarro, hasta la casita, hay "un camino de herradura, piedra suelta, sin zanja, con alguna gravilla y piedra suelta también" . . . "tiene más o menos como cuatro metros" de ancho . . . "de verja a verja" con "alambrada a ambos lados" . . . con "unas pendientes bastante prolongadas", (Nazario t. 140) ; si desde la casa esa dentro de la finca del señor Zayas Pizarro (sureste) hasta el sitio donde

están los yacimientos (suroeste) se hiciera un camino no podría sacarse piedra por dicho camino . . . "porque es demasiado inclinado . . . el sitio es demasiado empinado" . . . costaría mucho hacer la carretera dentro de la finca del Lcdo. Zayas Pizarro . . . también . . . "dentro del camino existente"; pueden subir *trucks* "pero pueden subir una o dos veces, pero si usted tiene que subir este *truck* cuatro o cinco veces no es recomendable" . . . desde la casita se puede construir un camino que vaya a la cantera . . . "allí se podría hacer, pero creo que es demasiado costoso, porque aquello es piedra, demasiado duro", (Nazario t. 169–170).

El tercer testigo en declarar sobre la condición actual del camino de uso público existente, presentado por el demandante y apelante fué el señor Donato Zayas Pizarro, quien declaró en los siguientes términos: "la finca yo creo que es casi un noventa por ciento de piedra", (Donato Zayas Pizarro t. 172) . . . es una finca bastante quebrada y la parte sur y este la bordea el camino . . . de Las Cuevas . . . la distancia que hay desde la terminación de la carretera del Naranjo hasta la finca del señor Zayas Pizarro donde está la casita (extremo sureste) es "alrededor de una tercera parte de un kilómetro más o menos . . ." trescientos metros, (Donato Zayas Pizarro t. 173–174); "un camino de tierra, vecinal, que tiene más o menos el ancho de los caminos en Puerto Rico, vecinales, eso es, tres metros o tres metros y medio, en algunos sitios tiene hasta cuatro" . . . "no está afirmado, es de tierra, no tiene cunetas" en cuanto a su inclinación es una cuesta "fuerte" . . . "como está el camino, sería imposible bajar un *truck* con cuatro metros de piedra por esa pendiente . . . quizás podría pasar una vez, pero la segunda vez se le quemarían los frenos o cualquier trastorno", (Donato Zayas Pizarro t. 174) . . . "el sitio más apropiado está en la parte más baja de la finca" . . . "en la parte oeste y suroeste" . . . la piedra de la parte suroeste no se podría llevar a la casita (sureste) y después

pasarla por el camino existente porque "habría que hacer un camino muy costoso que quizás no subirán los *trucks* por la pendiente", (Donato Zayas Pizarro t. 175) . . .

El cuarto testigo en declarar sobre la condición actual del camino de uso púlico existente, presentado por el demandante y apelante, fué el señor Juan Pibernus, quien declaró en los siguientes términos: *suponiendo* que existiera una cantera en la parte este de la finca del señor Zayas Pizarro, o sea, cerca de la cantera, creo que no podrían bajar los *trucks* cargados de piedra . . . a menos que el camino se asfaltara . . . porque "la cuesta es muy fuerte, muy empinada y domina la carga y la carga puede dominar el carro", (Pibernus t. 200) . . . el camino se podría reparar pero dándole "el ancho suficiente y *que dominen la cuesta*" . . . "solamente llegar a la casita pero de ahí no tiene acceso a la cantera".

El quinto testigo en declarar sobre la condición actual del camino de uso público existente, presentado por el demandante y apelante, fué el propio demandante y apelante señor Vicente Zayas Pizarro, quien declaró en los siguientes términos: "me refiero al camino desde donde termina el camino del Naranjo, asfaltado, hasta la casa que está en mi finca, que está en una esquina de la parte sureste" . . . *"lo he utilizado para ir a ver la finca*, porque frutos menores los que se han cogido, se puede decir que son unas . libras de gandules", (Vicente Zayas Pizarro t. 254–255) ; el camino no se interna en la finca "en ningún sitio, cuando yo fuí a hacer la casita y demás, había sus discusiones y demás de que una talita no era mía y demás y se tiró la línea y la línea queda subiendo en el lado vecinal que da a las Cuevas" . . . , (Vicente Zayas Pizarro t. 270) . . . el camino no cruza la finca, "sigue y florea a una distancia hay una cerca puesta de alambre por mí", (Vicente Zayas Pizarro t. 279–280).

El sexto testigo en declarar sobre la condición actual del camino de uso público existente presentado por los demandados y apelados, fué el señor José Dolores Santiago, quien declaró en los siguientes términos: el camino de las Cuevas, "llega una parte hasta el empalme en brea *y de ahí para arriba es el camino de nosotros "traquinar"* . . . "desde que yo nací se conoce ese camino siempre como nosotros" . . . pasa por la finca del señor Zayas Pizarro "pero derecho arriba" . . . si se cierra ese camino, él no tendría otro camino para salir a la carretera pública . . . "ese camino no lo aflojamos nunca, no lo aflojaremos nunca ese camino" . . . ha visto por el camino cruzar *carros, automóviles "de esos que gastan gasolina"* . . . "unos *truses* de esos grandes y con piedras del señor Daleccio" (la cantera del señor Daleccio queda más abajo cerca de la carretera embreada) . . . hasta la casita caminan *carros* . . . los carros de servicio público viran en el empalme . . . "para los que llegan con carros que nos aflojan a nosotros ahí, pero suben los *carros* arriba a la casa del señor don Vicente Zayas Pizarro" . . . cuando él ha tenido que transportar del pueblo de Juana Díaz a su casa, camas, colchonetas o artículos pesados que vienen en esos *carros públicos,* los carros públicos en alguna ocasión lo han subido hasta la casita del señor Zayas Pizarro . . . una vez subió un *truck* de don Vicente Daleccio "pues, que suba una vez, pero subió bien y bien bajó" . . . no sabe el ancho del camino . . . "camino llano en parte *por algún caminito que se puede arreglar mejor para subir y claro todo lo que usted quiera sin peligro"* . . . no sabe manejar automóviles . . . "ni quiero saber, señor, no sé ni quiero saber de ellos . . ." el testigo tiene "como sesenta años o setenta años", al decirle al señor Zayas Pizarro que tenía noventa y siete años "no tiene nada que ver, porque yo diga eso en chanzas, o cosa así, eso no tiene nada que ver eso es por nosotros divertirnos allí" . . . recuerda que el *truck* que subió a buscar piedra allí, "como más de dos años" . . . no

sabe lo que es un *jeep* . . . no sabe si por allí se sube en primera velocidad, en segunda velocidad o cómo se sube "como yo no ando con carros, ahora si usted me da, si usted me dice una yegua, manejándola derecho arriba y derecho abajo" . . . si llueve los *automóviles* pueden subir y bajar . . . "yo he visto subir *carros* allá, *truses*, allá, a llevar provisiones, alimentos, provisiones a la misma casa suya" . . . "todos los jueves" no puede decir la carga que llevan "porque no soy quien las llevo, los dueños de las tiendas, los comerciantes saben" . . . sabe que suben como cien *trucks* "porque yo veo subir de casa, del mismo *soberao* de casa veo subir la bestia cargada cuatro veces suben bestias y la cogen en la casita suya" . . . hay veces que la cogen abajo (en el empalme) ahora la cogen allá en lo suyo" (en la casita) . . . las provisiones las suben en *truck* hasta la casa y de ahí en adelante en bestias . . . lo sabe porque ve las bestias después que van cargadas "yo las veo con mis ojos . . . cuando pasan por casa" todos los jueves suben *trucks* con provisiones (José Dolores Santiago t. 321–337).

El séptimo testigo en declarar sobre la condición actual del camino de uso público existente, presentado por los demandados y apelados, fué el señor Tomás Santiago, quien declaró en los siguientes términos: los *trucks* pueden virar en la casita . . , el sitio no es "muy anchísimo pero que viran los *trucks*" . . . los vecinos del Barrio Cuevas acostumbran bajar al pueblo "en bestias hasta la casita . . . de don Vicente Zayas Pizarro . . . y de ahí *vienen* en guaguas, *trucks* y *pick-ups* que vienen a buscar gente y a traer gente" . . . los *trucks* vienen "con provisiones de dos tiendas que hay" . . . "*casi todos los días sube* un *truck* allá" . . . no sabe los quintales que lleva . . . cuando llueve "hay veces que suben" . . . "Daleccio subió el martes pasado y estaba lloviendo" . . . no sabe la inclinación que tiene ese camino ni el ancho . . . *no caben dos trucks en ese camino* . . . cabe una yegua con banastas, un caballo y además un

*truck* . . . cuando el señor Zayas Pizarro sembró cañas, vió que se bajaba caña en un *truck* "subía vacío y bajaba lleno, y cuando llevaba la semilla bajaba lleno" . . . "bajaba casi lleno", . . . más abajo de la baranda: (Tomás Santiago t. 337–351).

El octavo testigo en declarar sobre la condición actual del camino de uso público existente, presentado por los demandados y apelados, fué el ingeniero *agrónomo* señor Pelayo Vals, quien declaró en los siguientes términos: "el camino en sí tiene poco más de cinco kilómetros embreado, *y de ahí en adelante* es un camino vecinal, de herradura que se conoce, sin brea, como de cuatro a cinco metros de ancho en algunas partes, *llano en parte y con dos pendientes hasta la terminación de una casa* que se encuentra enclavada en la colindancia del señor Zayas Pizarro . . . que el camino *podría* ser susceptible de arreglo para que pasaran por él vehículos pesados de motor . . . *podrían* bajar por ese camino *trucks* con piedra marmórea . . . podrían pasar vehículos privados de motor . . . "con mucha facilidad en tiempo de sequía, *quizás con un poco de tropiezo y cuidado cuando está húmedo*" . . . al llegar a la finca del Sr. Zayas Pizarro "el camino va por encima de la cuchilla" . . . el camino "según se ve que está trazado por años inmemoriales, o por el tránsito, o por el efecto del tránsito, *o por efecto de erosión*, está marcado y llega directo a la casa de Vicente Zayas Pizarro" . . . "es una prolongación de la carretera" . . . "aquello puede tener alrededor de trescientos metros . . . tiene una inclinación aproximada de dieciséis . . . (dieciséis por ciento) . . . yo puedo subir en segunda o en primera en automóvil, "depende de si el camino está mojado" . . . "bajo un tiempo de lluvia quizás no" . . . allí se encuentra de todo piedra suelta y tierra suelta, (Vals t. 351–371).

El noveno testigo en declarar sobre la condición actual del camino de uso público existente, presentado por los de-

mandados y apelados, fué el señor Vicente Daleccio, uno de los demandados y apelados, quien declaró en los siguientes términos: "el camino es bastante bueno" . . . *pueden* transitar *jeeps, pick-ups*, carros de pasajeros y *trucks* . . . *ha visto* subir carros de turismo "a veces a llevar provisiones y a veces a llevar pasajeros", (Daleccio t. 371–373).

Después de recibir estos testimonios, el Juez que presidió la vista del caso, acompañado de las partes y sus abogados y de los oficiales del tribunal que intervienen en esta clase de diligencia, celebró una inspección ocular. Del acta de dicha inspección tomamos las siguientes indicaciones sobre el estado actual del camino de uso público existente: "adentrándose en el camino de las Cuevas, se mide el ancho del camino vecinal y resulta tener tres metros sesenta centímetros y solamente hay una zanja que tiene veinte pulgadas; a ciento veinticinco metros se vuelve a medir el ancho del camino, donde no hay cunetas, y de cerca a cerca, tiene tres metros setenta y cinco centímetros; aparece al lado izquierdo, a la orilla del camino, en la parte baja del talud la cerca; como a ciento cincuenta metros se mide el ancho del camino y resulta tener cinco metros setenta centímetros; como a doscientos o doscientos cincuenta de la carretera del Naranjo, se mide el camino y tiene cuatro metros diez centímetros; en la propia colindancia de los terrenos del demandante con los demandados, en un camino vecinal, hay una distancia de nueve metros de la casita, el camino tiene un ancho, sin cuneta de cinco metros diez centímetros más o menos" . . . (Legajo 18–19); "hágase constar que en el punto donde estamos, y que el señor Zayas Pizarro ha declarado que no sabe si es parte o no de su finca, no hay alambres, verja o empalizada de clase alguna, que divida los terrenos de Zayas Pizarro de los del camino, y por el contrario, hay una cerca entre los terrenos de la Sucesión Daleccio y el camino; llegados a este terreno (casita) se encuentran dos *trucks* de tumba, uno marca Ford y el otro Dodge; uno

de ellos cargado con un metro de piedra en bloque; se muestra una alambrada y zarzas y aparece todo cubierto de malezas y breñas, al lado izquierdo siguen las cercas y al lado izquierdo subiendo, están los terrenos del señor Zayas Pizarro y los terrenos al lado derecho son de los demandados, y se continúa caminando por el camino; medido todo el camino, resultan ser doscientos noventa metros de largo el camino . . . se llega a un llanito, *después de bajar una montaña*, observando unas piedras muy altas, que es el sitio donde se haría la cantera, notándose que también todo está rodeado de árboles, maleza y yerba de guinea . . . que no hay caminos dentro de la finca del demandante y sí veredas, caminos de a pie y de herradura y que dichos caminos están dentro de la finca, *que es una finca quebrada, de montes y un pequeño valle en el centro*, cerca de donde está la cantera, con excepción del camino arriba, que va de la carretera a la casa donde vive un agregado del señor Zayas Pizarro y que la casa del agregado está dentro de la finca del señor Zayas Pizarro" . . . (Legajo 19–21). El resto del acta que tiene algo que ver con la practicabilidad, la seguridad y con las posibilidades de reparar el camino de uso público existente, por no seguir la forma narrativa usual, nos vemos obligados a transcribirlos literalmente en la forma dialogada en que aparece:

"¿De la observación aproximadamente que usted ha hecho, en el camino viejo, en el existente de Las Cuevas, cuál es la inclinación en los sitios más altos?

"Sr. Nazario: Aproximadamente quince o diez y seis por ciento.

"¿Aproximadamente, por la ruta recorrida en los terrenos de Daleccio, cuál sería la inclinación?

"Ocho por ciento.

"Lcdo. Colón: Que se haga constar que la parte demandada no admite esas conclusiones del perito.

"Juez: ¿Este camino de una inclinación de diez y seis por ciento más o menos, es susceptible de reparación y mejoras?

"Sr. Nazario: Sí, señor.

"¿Por su experiencia (que ha sido aceptada su capacidad como perito ingeniero), el costo de reparación de ese camino, ensancharlo y repararlo para hacerlo más viable al tránsito de vehículos pesados y livianos de· motor, en relación con el camino solicitado, de haber diferencia, cuál sería la diferencia aproximadamente?

"Sr. Nazario: En realidad es una pregunta difícil. Habría que hacer un estudio. Podría haber otra posibilidad, que en otro sitio el terreno sea más blandito.

"Juez: A base de lo caminado, aproximadamente, si usted puede.

"Lcdo. Zayas Pizarro: Creo que es improcedente la pregunta, porque la mayor o menor inversión para el nuevo camino no está en "issue", y es un gasto que yo cubriría, no importa cuál fuere, por ser para mi uso exclusivo.

"Juez: ¿Podría contestarme la pregunta? ·

"Sr. Nazario: Sería difícil.

"Lcdo. Zayas Pizarro: Para hacerlo transitable, sin asfaltado y sin empedrado.

"Juez: Nadie ha dicho empedrado. Para hacerlo transitable para vehículos pesados y livianos de motor.

"Sr. Nazario: Es difícil, debido a que hay que hacer dos o tres estudios, o llevarse más arriba si se consigue más blando.

"Lcdo. Colón: Objeto, porque tendría que circunscribirse al camino donde veníamos.

"Sr. Nazario: Habría que hacer varios estudios, y no se puede establecer ahora con exactitud.

"Juez: La pregunta más o menos es la misma. ¿Cuál sería más costoso, reparar éste o construir el nuevo?

"Sr. Nazario: Es difícil.

"Juez: Se hace constar que en parte del camino recorrido no aparecen piedras por dentro de la finca de Daleccio, y asimismo se hace constar que hay una hondonada.

"Juez: ¿Alguna otra pregunta al señor Nazario?

"Lcdo. Hernández Matos: Señor Juez: Si arreglándose este camino de Las Cuevas de la mejor manera posible, aún poniéndose concreto, si eso constituiría una vía segura y practicable con referencia al sitio donde se va a explotar la cantera.

"Juez: Eso sería cuestión de testimonio. Conteste.

"Sr. Nazario: Se podría arreglar.

"Lcdo. Colón: Practicable para llegar hasta la finca del demandante.

"Sr. Nazario: Hasta la casita.

"Juez: La corte no admite la última pregunta de los costos, porque no estamos en el juicio.

"Lcdo. Zayas Pizarro: Tomamos excepción.

"Juez: Además, el testigo ha dicho que no puede valorar lo que costaría la reparación. Se le pregunta al señor Daleccio ahora, ¿la pregunta es?

"Lcdo. Colón: La pregunta al testigo Daleccio, como demandado, es si él cree que construir el camino solicitado sería mayor o menor costo que la reparación del camino existente.

"Juez: La corte deniega la pregunta, por entender que estamos en una inspección ocular, que es para hacer observaciones. Se hace constar que al perito, por ser perito ingeniero, se le pidieron las conclusiones y se hace constar que le era imposible establecer los cálculos. En este momento el demandante solicita que el *truck* que tenía aproximadamente un metro de piedra en bloque, suba hasta un punto, se detenga y vuelva a subir.

"Lcdo. Colón: Cargado no.

"Juez: La corte ordena que suba.

"Lcdo. Zayas Pizarro: Me opongo a que suba a toda velocidad.

"Juez: Que suba en la forma solicitada, y como en un principio la parte demandada se allanó.

"Lcdo. Zayas Pizarro: Desisto, por razón que no se dieron instrucciones que pare.

"Juez: La corte dió la instrucción pertinente. Si se ha desistido, dígase con claridad. La corte dió la orden de que el *truck* subiera cien metros y se parara.

"Lcdo. Zayas Pizarro: Insistimos en la pregunta.

"Lcdo. Colón: La parte demandada se allana, aunque creo que es lógica. Que se haga constar que el *truck* Ford se para en un sitio de lo más empinado, por la observación personal del mismo juez; que estuvo totalmente parado y acaba de subir la cuesta.

"Juez: Dicho primer *truck* estaba vacío. Se hace constar que el *truck* Dodge, más o menos del año treinta y nueve, paró en el mismo sitio que el anterior, cargado con un metro de piedra en bloque, y subió con más facilidad que el *truck* vacío.

"Se hace constar que la observación es que el terreno está completamente seco, y están secos los pastos y breñales de ambas fincas.

"La corte hace constar que no se ha sugerido que la corte haga ninguna otra pregunta. Es la una de la tarde. Entonces, la inspección ocular ha terminado . . ." (Legajo 22–27)

Después de recibidos los testimonios antes expuestos y de realizada la inspección ocular arriba transcrita, la ilustrada Sala sentenciadora concluyó: "que el camino aun cuando no está afirmado o asfaltado *es susceptible de ensancharse y mejorarse . . . que a pesar del estado actual del camino* por el mismo pueden transitar vehículos pesados de motor con carga y sin carga . . . *que ensanchando el camino* y afirmándolo o empedrándolo o pavimentándolo sería propio, ya que conservándolo se evitaría el que el mismo se dañara por lluvia . . . *que a pesar de su estado actual* por el mismo se puede transitar con seguridad tomando desde luego, las precauciones necesarias *a un terreno accidentado y a un camino angosto . . . que siendo susceptible de arreglo y reparación el camino existente* que enlaza la carretera insular del Naranjo con la finca del demandante y pudiendo construirse un camino que enlace los yacimientos de piedra con el camino que va de la finca del demandante a la carretera *aun cuando éste resulte a un precio exorbitante*—se desprende del resto de la prueba—no procede se conceda la servidumbre de paso solicitada."

Como se ve, la ilustrada Sala sentenciadora lo que en realidad de hecho concluye, es, en cuanto a la practicabilidad, que se trata de un camino angosto que puede ser ensanchado; en cuanto a la seguridad, que el mismo resulta transitable si se toman las precauciones necesarias a un terreno accidentado; y en cuanto a la suficiencia para el mejor aprovechamiento del fundo que solicita la servidumbre, la deja condicionada a la posibilidad de que el camino existente sea reparado. Hasta qué extremo tal cuadro resulta suficiente para derrotar el derecho del demandante y apelante, se verá mejor, después de la exposición de la teoría jurídica del derecho de servidumbre.

La ley aplicable al caso es el art. 500 del Código Civil de Puerto Rico, ed. del 1930, que extractado en la parte pertinente al estudio de este caso, dispone: "El propietario de una finca o heredad enclavada entre otras ajenas y sin salida a camino público, tiene derecho a exigir paso por las heredades vecinas, previa la correspondiente indemnización."

Comentando el art. 564 del Código Civil español correspondiente al art. 500 del nuestro, dice Manresa: . . . "Lo del aislamiento, con relación al fin de la servidumbre, no ha de interpretarse de una manera material, *sino relativa a la necesidad que se quiere satisfacer*, y que no puede ser satisfecha por no hacer el acceso conveniente, dada la necesidad, hacia la vía pública. Infiérese esto, sobre todo del art. 566, como luego veremos [correspondiente al art. 502, que dispone: la anchura de la servidumbre de paso será la *que baste a las necesidades del predio dominante*] . . . . se puede reclamar la servidumbre en cuanto el predio dominante esté rodeado de otros ajenos y sin salida a camino público. Así dice el texto. Pero el texto exige no pocas aclaraciones. ¿Cuándo se estimará que un predio no tiene salida a camino público? Realmente, debe estimarse en esta condición; no sólo el fundo que no la tiene en *absoluto, sino también el que no tiene una bastante segura o practicable:* un fundo que linda con un camino público *mediante un declive o pendiente inabordable*, está realmente aislado para el efecto de la servidumbre que se pide por su dueño. . . . Lo que sí debe advertirse es que, en todo caso, la necesidad que mueve al propietario a reclamar la servidumbre de paso ha de ser presente y no futura. La naturaleza forzosa, impositiva, legal de la servidumbre de paso, excluye el derecho del propietario de un fundo aislado a reclamarla: 1º cuando el aislamiento proviniera de su voluntad—un propietario que aisla su finca del camino por haber levantado edificaciones de cualquier clase—, y 2º, por simple comodidad. La comodi-

dad no puede incluirse en el supuesto de necesidad a que el Código alude expresamente . . . El art. 566 refiérese a la *anchura de la servidumbre*. Esta condición, según el tenor expreso del Código, se determina exclusivamente con arreglo al interés del predio dominante. Es este un punto en que el legislador ha cambiado de un modo muy radical los precedentes que la servidumbre de paso, como voluntaria, tiene en el Derecho antiguo. Ya hemos dicho, que tanto el Derecho romano como el Derecho de las Partidas, distinguían, *según las necesidades del predio dominante*, tres formas de servidumbre de paso. Hablaban las Partidas de senda—por donde se puede ir a pie, o cabalgando solo o con otros . . . de manera que vayan de uno en uno e non en par—; de carrera—que se puede por y traer carretas . . .—, y de vía—que se puede ir por ella a pie o cabalgando, solo o acompañado, con carretas . . . , arrastrando, etc. El Código prescinde de estas distinciones y establece un principio vago, indeterminado al pronto, pero que circunstancialmente se habrá de adaptar, de un modo adecuado, teniendo en cuenta *que la servidumbre ha de imponerla la necesidad del predio dominante*, necesidad que también ha de determinar su anchura. Y no sólo esto: una interpretación recta del precepto del art. 566 lleva a sentar el principio de que *la servidumbre de tránsito podrá modificarse, después de establecida,* según lo exijan las necesidades del predio dominante. Como advierte Ricci, *impuesto el paso en atención a las necesidades de la finca o heredad,* no tiene más remedio sino sufrir las contingencias y variaciones de estas necesidades." 4 Manresa—Comentarios al Código Civil Español—págs. 787–788–793 (Sexta ed. del Instituto Editorial Reus de 1951). (Bastardillas y corchete nuestros.)

Comentando el mismo artículo dice Scaevola: "el otro requisito, el principal, es que la finca no tenga salida a camino público. Las palabras del artículo inducen a afirmar que es menester para la imposición del gravamen *que no*

*tenga salida el fundo a un camino, y que éste sea público.*
¿Será así efectivamente? Opina Laurent que cabe establecer el paso, no sólo cuando no hay salida a un camino, *sino cuando éste es insuficiente; porque si un propietario sólo puede utilizar un sendero y necesita un camino, cabe considerarlo realmente enclavado,* y añade que así lo ha establecido la jurisprudencia francesa. Nosotros nos inclinamos también a esta solución. *Si el fundamento del derecho de paso es la necesidad del predio dominante,* la determinación, la realización del derecho *ha de subordinarse a la necesidad.* Si la del predio dominante *exige una vía más ancha que la del camino público, podrá exigir otra, porque aquélla es como si no existiese* . . . Por esta misma razón será lícito exigir el paso *cuando, habiendo camino,* éste se haya destruído o inutilizado por inundaciones, desprendimiento de tierras, etc. No hay camino, y es preciso establecer una salida temporal, o sea, mientras no se recomponga el destruído."
10 Scaevola—Código Civil—581–582, (quinta ed. del Instituto Editorial Reus del 1947). (Bastardillas nuestras.)

Sobre esta misma cuestión, comenta Castán: "puede ser definida la *servidumbre forzosa de paso,* en vista del art. 564 del Código Civil, como el derecho que se concede al propietario de una finca o heredad, enclavada entre otras ajenas y sin salida a camino público, para exigir paso por las heredades vecinas, previa la correspondiente indemnización. Aunque la ley sólo habla del propietario, entienden los autores que puede pedir la constitución de esta servidumbre toda persona que por virtud de un derecho real pueda cultivar y usar un fundo, como el usufructuario, el usuario o el enfiteuta. Requisitos para su constitución. —Son los dos siguientes . . .: 1º que se trate de una finca enclavada entre otras ajenas y sin salida a camino público. A pesar de los términos absolutos del art. 564 [500 nuestro], entiende la doctrina (Sánchez Román, De Diego, Manresa, etc.), *que no es preciso que no haya ninguna salida a camino público,*

sino que bastará que, *aunque la haya, sea peligrosa, difícil* o insuficiente. 2º que se abone la correspondiente indemnización." 2 Castán—Derecho Civil Español Común y Foral— 524–525 (séptima ed. del Instituto Editorial Reus de 1950). (Bastardillas y corchete nuestros.)

Sobre esta misma cuestión, dice Sánchez Román: ". . . Como la constitución de esta servidumbre de paso depende de la condición precisa de que la finca esté enclavada entre otras y sin salida a camino público, puede surgir la duda de si esta condición ha de entenderse de un modo absoluto o de un modo relativo; esto es, si será preciso que no haya ninguna salida larga ni corta, suficiente ni insuficiente, cómoda ni incómoda, fácil ni difícil, por tierra o por agua, y que la falta de ella sea cualquiera, imputable o no imputable al propietario que pide la constitución de la servidumbre de paso en finca ajena para poner la suya en comunicación con una vía pública. Entendemos que el espíritu del Código es el de considerar llegado el caso de exigir la constitución de la servidumbre en los supuestos siguientes: 1º Cuando no haya realmente ninguna salida a camino público; 2º Cuando, aunque ésta exista, *sea de difícil o peligrosa práctica* por ser aquél fluvial, o *aun siendo terrestre*, sea *notoriamente insuficiente* para el cultivo de la finca, pues en estos dos últimos casos el ser *peligroso, impracticable* o *insuficiente* equivale a no existir, casos distintos de la hipótesis en que existiera, aunque fuera incómodo o largo, circunstancias bastantes a impedir el derecho a exigir la constitución de la servidumbre de paso." 3—Sánchez Román, Estudios de Derecho Civil—617–618 (Segunda ed. de Sucesores de Rivadeneyra de 1891). (Bastardillas nuestras.)

Las normas generales establecidas por el Derecho Civil español que resultan ser las fuentes originarias de nuestro propio Derecho Civil, son las siguientes: (1) se estimará que un predio no tiene salida a camino público, no sólo cuando el predio no la tenga en absoluto, sino también cuando

teniéndola, la misma no es bastante segura, practicable o suficiente; (2) *la servidumbre ha de imponerla la necesidad del predio dominante*, debiendo determinarse la anchura de la servidumbre con arreglo al interés (necesidad del predio dominante); (3) la servidumbre de tránsito podrá modificarse, después de establecida, según lo exijan las necesidades del predio dominante; impuesto el paso en atención a las necesidades del predio dominante, la servidumbre sobre el predio sirviente no tiene más remedio que sufrir las contingencias y variaciones de estas necesidades; (4) *si la necesidad del predio dominante requiere una vía más ancha que la del camino público*, podrá exigir otra, porque aquélla es como si no existiese; (5) el dueño del predio dominante no tendrá derecho a exigir la servidumbre de paso cuando el aislamiento de su predio provenga de actos de la propia voluntad del dueño, como es el caso de haber obstruído con edificaciones la salida al camino existente; (6) las servidumbres de paso deben concederse con vista a la necesidad y al mejor aprovechamiento del predio dominante y no a su comodidad y la necesidad debe ser presente, o sea, de realización inmediata y no futura, o sea, remota y especulativa.

Hemos examinado los últimos casos resueltos por este Tribunal—*Nin* v. *Rucalleda*, 28 D.P.R. 542 (Hutchison), (1920); *Compañía Azucarera del Toa* v. *Galán*, 28 D.P.R. 844 (Hutchison), (1920); *Miner* v. *Irizarry*, 52 D.P.R. 206 (Del Toro), (1937); *Tirado* v. *Caro*, 72 D.P.R. 748 (Todd, hijo), (1951); *Román* v. *Jiménez*, 76 D.P.R. 569, (Sifre), (1954) y ninguno de dichos casos es aplicable al presente caso. En ellos se consagra el principio general de la doctrina española que se estimará que un predio no tiene salida a camino público, no sólo cuando el predio no la tenga en absoluto, sino también cuando teniéndola, la misma **no es bastante segura, practicable o suficiente**, pero en ninguno de dichos casos se ha planteado la falta de accesibilidad del camino existente o la insuficiencia del camino existente para el mejor aprovechamiento del predio dominante.

■ La concesión de una servidumbre de paso es siempre una excelente oportunidad para la aplicación práctica del concepto jurídico de la razonabilidad. Lo que debe investigarse serenamente es, si se trata de una solicitud infundada, inspirada en la simple comodidad del solicitante o si se trata de una solicitud fundada en la necesidad o en el mejor aprovechamiento del fundo. Como es sabido, en la concesión de una servidumbre de paso se debe hacer abstracción de las personas envueltas en la petición del derecho, pues por encima del interés individual tanto del propietario del predio dominante como del propietario del predio sirviente, que resulta siempre transitorio, temporal, está la filosofía económica sobre la mejor productividad de los fundos: *Nin* v. *Rucalleda et al*, supra, cita precisa a la pág. 548—y está el ánimo característico del bien común, el interés económico del Estado que no favorece la perpetuación de fundos baldíos, declaración de Derecho público que no resulta incompatible con la mejor concepción civilista, pues sabido es asimismo, que nuestro Código Civil contiene no solamente elementos de Derecho privado, de índole estrictamente civilista, sino elementos de Derecho público: Vide, Antonio Hernández Gil—El Concepto del Derecho Civil—págs. 17 *et seq.*, (ed. de la Revista de Derecho Privado del 1943). Como bien dice Scaevola: "El paso es forzoso, y así lo reconocen los Códigos modernos, porque, como dice Albisson, sería imposible la cultura y explotación de un campo enclavado entre otros y sin salida a camino público, si la ley no abriese para el dueño, en los fundos circunvecinos, *un paso proporcionado a sus necesidades;* y el interés general—manifiesta Berlier—no permite que haya fundos colocados fuera del dominio de los hombres o improductivos, porque para llegar a ellos haya que atravesar las heredades ajenas." 10 Scaevola 571 (obra y ed. citadas). Por esta misma razón observa Manresa, glosando el parecer de Ricci, según ya hemos visto, que las servidumbres de paso no deben ser estáticas sino que

deben transformarse de acuerdo a como se transforman las necesidades del fundo.

De modo y manera que en la concesión de una servidumbre hay siempre un hecho natural a ser observado, independiente del hecho objetivado a través de la teoría, y en dicha observación, se debe hacer abstracción total de cualesquiera otros intereses que no sean el beneficio del propio fundo, pues éste es el punto de conciliación entre el interés privado y el interés público. Lo que pueda o no pueda convenir a la explotación normal del fundo o a su transformación para un más cabal aprovechamiento de su riqueza es lo realmente importante, y por ende, lo jurídico. Si se trata de una necesidad razonable que puede servirle de proyección al derecho de disponer de un bien privado en beneficio del bien común, debe concederse. Si se trata de una solicitud fundada en la mera comodidad, o de la cual podría responsabilizarse al dueño del predio dominante por su propia acción, debe denegarse, pues como advierte Puig Peña: "Aquí es donde más propiamente se encuentra la actuación *civiliter*, entroncada posiblemente con la teoría del abuso del Derecho, que impide llevar a cabo el ejercicio de nuestra propia facultad *cuando, no produciendo un beneficio propio, se causa un perjuicio ajeno*." III—I Puig Peña—Tratado de Derecho Civil Español, 402. (Bastardillas últimas nuestras.)

De la teoría jurídica expuesta se ve que el concepto "práctico", el concepto "seguro" y el concepto "suficiente", aunque algunas veces se ilustran con algunos ejemplos, para que sirvan de índice al principio analógico, no se definen ni se limitan, y por lo tanto se deja en libertad al juzgador, para aplicar los mismos dentro de la extensa variedad de circunstancias que pueden presentarse en determinado caso, pero no de una forma arbitraria, sino teniendo en cuenta tanto la filosofía de la institución de derecho, como sus cánones de interpretación particular.

■ Lo que se entiende por un camino practicable en el sentido popular de la palabra, no es un camino que posea cierto grado de accesibilidad sino una transitabilidad ordinaria y corriente. En este caso quedó demostrado por la prueba pericial, (Giles t. 53), (Nazario t. 153–154), (Vals t. 362) que de acuerdo con las normas generales del gobierno de Puerto Rico, la inclinación normal de un camino no debe ser más de un siete por ciento o un ocho por ciento, (siete u ocho metros de elevación por cada cien metros), criterio que debe seguirse ya que no se trata de una servidumbre legal de carácter privado, sino de un camino dedicado al uso público. Es obvio que un camino que tenga de dieciséis a veinte por ciento de inclinación no resulta practicable. La Ley núm. 8 de 16 de mayo de 1919 "fijando la anchura de las carreteras insulares y *caminos municipales*" establece, que "las carreteras de tercer orden y los *caminos municipales* tendrán como límite un ancho no menor de cinco (5) metros más el ancho adicional necesario en cada caso para las cunetas de la carretera por una faja de terreno de un (1) metro de ancho a partir del borde exterior de los taludes", criterio que debe seguirse ya que no se trata, como antes hemos dicho, de una servidumbre legal de carácter privado, sino de un camino dedicado al uso público. Es obvio que un camino, que medido por el propio Juez que presidió la vista, resulta en su totalidad de doscientos noventa metros de largo, de los cuales ciento veinticinco metros tienen una anchura de tres metros setenta y cinco centímetros (legajo 18), no resulta practicable para el tráfico pesado de nuestro tiempo.

■ Lo que se entiende por un camino seguro, en el concepto popular de la palabra, no es un camino por el cual se pueda caminar tomando precauciones extraordinarias, sino un camino de facilidad ordinaria y corriente. El propio perito de los demandados y apelados lo describe así: "es un camino vecinal, de herradura que se conoce, sin brea, como

de cuatro a cinco metros de ancho en algunas partes, *llano en parte y con dos pendientes* hasta la terminación de una casa que se encuentra enclavada en la colindancia del señor Zayas Pizarro", (Vals t. 352) . . . "el camino según se ve que está *trazado* por años inmemoriales, *o por el tránsito,* o por efecto de erosión, está marcado y llega directo a la casa de Vicente Zayas Pizarro", (Vals t. 357). Tal descripción no resulta tan antitética e irreconciliable con la versión del perito del demandante y apelante señor Giles, que lo describe así: *"como todos los caminos de la altura y de montes,* hecho por el tráfico precisamente y por la lluvia, algún trabajo quizás de pico y pala, es un camino con mucha pendiente", (Giles t. 37–38) . . . "un camino vecinal de mucha pendiente, una superficie muy mala e inconveniente", (Giles t. 49) . . . "es barro y piedra y pedazos de piedra suelta", (Giles t. 50) . . . "para aclarar mejor, en varias partes el camino es una especie de zanjón" . . . (Giles t. 50) o con la versión del perito señor Nazario, que lo describe así: "un camino de herradura, piedra suelta, sin zanja, con alguna gravilla y piedra . . . tiene más o menos como cuatro metros . . . de verja a verja . . . unas pendientes bastante prolongadas", (Nazario t. 140). El plano topográfico del Gobierno de Puerto Rico demuestra que desde el empalme con la carretera hasta la casita del demandante y apelante que es donde termina el camino—pues desde allí hay que subir en bestia—según lo declaran los propios testigos de los demandados y apelados, el camino sube de doscientos cincuenta metros a cuatrocientos metros sobre el nivel del mar, en menos de trescientos metros de distancia. Si en ese trayecto de trescientos metros, hay terreno llano y dos pendientes, según declara el señor Vals, esas pendientes, en terreno suelto, indudablemente constituyen un paso difícil y peligroso para cualquiera clase de tráfico pesado.

Pero de las conclusiones de hecho se desprende que no fué la intención de la ilustrada Sala sentenciadora decla-

rar el camino práctico y seguro de una forma concluyente, sino que por ser susceptible de reparación, el mismo podría convertirse en un camino práctico y seguro después de reparado por el demandante y apelante. El error de la ilustrada Sala sentenciadora fué considerar el caso como uno de servidumbre legal de carácter privado, y como tal sujeto a las disposiciones del art. 479 de nuestro Código Civil que establece que: "el dueño del predio dominante podrá hacer a su costo en el predio sirviente las obras necesarias para el uso y *conservación* de la servidumbre, pero sin alterarla y hacerla más gravosa", en vez de considerarlo como uno de acceso a camino de uso público, de acuerdo con el art. 256 del Código Civil de Puerto Rico.   Dicho camino es propiedad del Municipio de Juana Díaz y es al Consejo Municipal de dicho Municipio al cual correspondería cualquiera acción para una nueva mensura, nuevo trazado, reconstrucción, mejora o refuerzo de dicho camino, según los arts. 65, 66, y 67 de la Ley Municipal de Puerto Rico, y las disposiciones de la Ley núm. 8 de 16 de mayo de 1919.   El demandante y apelante no sólo no tiene obligación de reparar dicho camino, sino tampoco tendría autoridad para proceder a cualquier ensanche o acondicionamiento que necesitara dicho camino para convertirse en práctico y seguro.   Siendo ésta la situación, para dirimir la cuestión litigiosa planteada por las partes, la ilustrada Sala sentenciadora ha debido considerar el derecho de pedir del demandante y apelante de acuerdo con el estado actual del camino, y declarar clara y precisamente, si ella consideraba dicha vía tal como está práctica y segura y además suficiente para cubrir las necesidades del fundo.

Lo que se entiende por camino suficiente *con relación a las necesidades del fundo*, que es una situación distinta a la simple necesidad de acceso a camino público, sin considerar la explotación agrícola e industrial del fundo, está mucho mejor definido por los comentaristas franceses,

gracias a la disposición del art. 682 del Código de Napoleón que dispone: "el propietario cuyos predios se hallen enclavados en medio de otra y no tengan salida alguna a la vía pública, *o aquella sea insuficiente para la explotación agrícola o industrial de su propiedad,* podrá reclamar el paso sobre los predios de sus vecinos, pagando una indemnización proporcionada al perjuicio que pueda ocasionarles"—Código de Napoleón concordado, pág. 172 (ed. de Juan Buxo, de la Habana, del 1921). Hasta cierto extremo este aspecto de la teoría francesa, en todo lo relacionado a las necesidades del fundo, resulta intercambiable con la teoría española, por el art. 566 del Código Civil español, equivalente al art. 502 del Código Civil de Puerto Rico, que dispone: *"la anchura* de la servidumbre de paso *será la que baste a las necesidades del predio dominante".*

Con relación a las necesidades que impongan la explotación agrícola o industrial del predio dominante, dice Planiol y Ripert: "La servidumbre de paso se concede por la ley en vista de la explotación de la finca: *su existencia así como su extensión, se subordinan a las necesidades de esa explotación.* Pero hay que entenderla de modo muy amplio. Como bien expresa el art. 682, nuevo, consagrando en este punto la jurisprudencia anterior, *la explotación industrial debe tomarse en consideración al mismo tiempo que la explotación agrícola.* El propietario, por tanto, podrá reclamar el paso así para *la explotación de una cantera,* de una turbera, de un glaciar o de un establecimiento, como para el cultivo de las tierras. *Hay que llegar más lejos aún.* El propietario de una finca enclavada es libre de explotarla como mejor le plazca, implantando en la misma las innovaciones que estime útiles, ampliando, por ejemplo, el establecimiento industrial de su propiedad *y reclamando, por tanto, un nuevo paso, si el primitivo es insuficiente. Puede aún cambiar totalmente el modo de explotación de su finca, abriendo, por ejemplo, una cantera en un terreno dedicado*

*anteriormente al cultivo,* elevando un edificio o un establecimiento industrial; *para satisfacer las necesidades de la nueva explotación, tiene el derecho de reclamar el paso que le sea indispensable . . ."* 3 Planiol y Ripert—Tratado Práctico de Derecho Civil francés—773, sec. 928, (ed. de la Cultural S. A. de la Habana de 1942).

Aunque el camino de uso público existente resultara práctico y seguro, también debe resultar suficiente al mejor aprovechamiento del fundo (teoría española) o a la explotación agrícola o industrial del fundo (teoría francesa). Si el camino de uso público resulta práctico y seguro, pero no resulta suficiente al mejor aprovechamiento del fundo, la servidumbre de paso debe concederse.

La prueba demostró en este caso que el demandante y apelante en la parte cultivable de dicha finca, un pequeño valle al centro, situado entre dos montañas de piedra que cubren todo el norte y casi todo el sur de la finca del demandante y apelante, trató de sembrar cañas y tuvo que abandonar el cultivo por las dificultades con la transportación por el camino de uso público existente, (Vicente Zayas Pizarro t. 255-257); que poco antes había tratado de arreglar el camino, "pero vino el primer aguacero fuerte y se llevó el trabajo que había hecho en ese pedacito de trescientos metros hasta la casita", (Vicente Zayas Pizarro t. 256); que la finca de ochenta y una y céntimos de cuerdas, "habrá que se puedan cultivar únicamente, porque hay algunas que hay que ir por encima de la montaña de piedra para buscar un sitio para cultivar, alrededor de quince o veinte cuerdas; el resto es una montaña de piedra", (Vicente Zayas Pizarro t. 258-259); la piedra en cuanto a cantidad "es inagotable, diez años se puede estar sacando piedra para todo el mercado de Puerto Rico y todavía sobra piedra". (Vicente Zayas Pizarro t. 263).

La necesidad de trazar la servidumbre solicitada por el extremo suroeste también está claramente establecida por la

prueba. De acuerdo con el testimonio del señor Juan Pibernus, cuya capacidad como experto en la industria de cantera aceptan ambas partes, "el camino que conduce a la finca actualmente, da acceso a la parte alta de la cantera y no a la parte baja, que es donde se explota"; que la cantera hay que explotarla por la parte baja porque "hay que ganar altura para tener beneficio"; "que tiene que tener altura la pared de piedra para que uno pueda explotar la parte baja y la parte alta se cae con la explotación de la parte baja . . . porque de otra manera habría que bajar la cantera piedra a piedra" . . . y sería "muy costoso"; que "mientras más alta la pared más beneficio tiene el que explota la cantera, por eso se dice que la cantera se coge de pie", o sea, "la base donde está la cantera y la parte más llana", (Juan Pibernus t. 194–195); que "después que tuviera el camino a la parte baja sería una cantera magnífica" (Pibernus t. 107). El mapa topográfico que forma parte de la prueba demuestra, que frente al camino de uso público existente que bordea el extremo sureste de la finca del demandante y apelante, se eleva un compacto bloque de piedra de cuatrocientos metros sobre el nivel del mar; que la parte semillana se encuentra en el extremo suroeste opuesto, que es desde donde dice el experto, que habría que empezar a explotar la cantera.

La solución que le encontró la ilustrada Sala sentenciadora a este imponente obstáculo natural, fué la construcción de un camino de enlace, que fuera desde la boca de la cantera hasta el camino de uso público existente. El error de la ilustrada Sala sentenciadora fué creer que dicho camino de uso público, por el hecho de bordear la finca de los demandados y apelados, constituía una servidumbre de paso de carácter privado, y entonces cualquier camino interior del predio dominante, para enlazar con la servidumbre de paso ya existente, debía ser por cuenta del demandante y apelante, aunque resultara a un precio exorbitante, por ser nece-

sario a la *construcción* y conservación de la servidumbre legal de carácter privado, de acuerdo con el art. 479 de nuestro Código Civil. No hay en la prueba indicio de clase alguna, sobre el hecho, que el camino de uso público existente, fuera en algún momento o a la fecha de la causa, una servidumbre legal impuesta sobre la finca de los demandados y apelados en favor de la finca del demandante y apelante. Casualmente es la propia prueba de los demandados y apelados la que establece fuera de toda duda, que se trata de un camino de uso público, un bien de dominio común, y no de una servidumbre legal de carácter privado en beneficio de un solo predio. El hecho que un camino público atraviese una heredad, no significa que sobre dicha heredad se encuentre establecida una servidumbre legal, de carácter privado, pues el camino nunca forma parte del cuerpo físico de la heredad. El plano de la finca de los demandados y apelantes, levantado con anterioridad a este litigio, marca el trazado de un camino vecinal como un cuerpo de bienes independiente a la finca de los demandados y apelados.

Las servidumbres se conceden con vista a las necesidades y al mejor aprovechamiento del fundo, haciendo abstracción de otros elementos de juicio. A veces la comunicación interior del fundo o su posible enlace con una vía práctica y segura por un sitio practicable dentro de la finca, que no represente ningún trastorno o sacrificio para el predio dominante, constituyen un cuadro de derecho, dentro del cual se puede determinar, que la servidumbre solicitada no constituye una necesidad sino una comodidad del predio dominante. Pero este no es el presente caso. La propia Sala sentenciadora reconoce la necesidad de que la cantera empiece a explotarse desde el suroeste, pues para denegar la servidumbre, dice que se puede trazar un camino a lo largo de la colindancia sur para el aprovechamiento de los yacimientos de piedra.

Estamos pues ante un caso probado de necesidad para el mejor aprovechamiento del fundo y no ante un caso de mera comodidad. Tan pronto se llega a la conclusión que la servidumbre solicitada es necesaria al mejor aprovechamiento del fundo, como las servidumbres se conceden en primera instancia, o se varían de acuerdo con las necesidades o transformaciones que impongan el mejor aprovechamiento del fundo, es obligación de los tribunales conceder la servidumbre. Los perjuicios que pueda sufrir el predio sirviente los puede aminorar, y en todo caso compensar, el tribunal, en el trazado exterior de la servidumbre y en la cuantía de la indemnización.

Cuando se examinan con detenimiento las conclusiones de hecho de la ilustrada Sala sentenciadora, se ve claro que el Juez que las hizo, entendió de buena fe que los hechos jurídicos de este caso eran similares a los hechos que motivaron la sentencia del Tribunal Supremo de España de 13 de marzo de 1901—91 Jurisprudencia Civil 338 (ed. de la Imprenta de la Revista de Legislación del 1901).

Para mejor entender la inaplicabilidad del caso español a los hechos de este caso, veamos cuales fueron los hechos realmente considerados (considerandos) por el Tribunal Supremo de España: *"Considerando* que a tenor de lo dispuesto en el art. 564 del Código Civil [artículo 500 nuestro], el propietario de una finca enclavada entre otras de ajena pertenencia, tiene derecho a exigir la servidumbre de paso por las heredades vecinas, tan solamente cuando la suya no tuviere salida a camino público; siendo, en su virtud, evidente *que carece de tal derecho el dueño que tuviere establecida en favor de su predio una servidumbre de esa especie,* aunque en su trayecto ocurriesen desperfectos susceptibles de reparación que impidan o inutilicen el tránsito, *máxime si desperfectos de esa entidad ocurrieren, no ya en el trazado de la servidumbre, sino en la vía que para enlazar con ella tuviese establecida el dueño dentro de su propiedad,* por ser

inconcuso que en tales circunstancias la finca enclavada no carece de salida, bastando para restablecer el pleno disfrute de la servidumbre establecida que el dueño del predio dominante *repare los desperfectos donde los hubiere o varíe el trazado si ocurriesen en el interior del mismo predio*, cargas ambas que afectan al mismo dueño y no a sus convecinos, los cuales tan sólo están obligados a dar paso cuando no lo hubiere. *Considerando* que, esto supuesto, resultan improcedentes los dos motivos primeros del recurso, puesto que para desestimar la demanda se funda el fallo recurrido, no tan sólo en que Doña Vicenta Peláez puede utilizar y utiliza una vía férrea y un paso, atravesando el río Jarama, para la explotación de su finca, lo que ciertamente no llenaría el objeto del mencionado art. 564, sino también y muy principalmente *en el hecho inconcuso de hallarse establecida desde antiguo sobre la finca de los demandados, en favor de la perteneciente a Doña Vicenta, una servidumbre* que permite el tránsito de peatones, carros y ganado, y si bien es cierto que existe un mal paso por efectos de las avenidas del río Jarama, *ese mal paso está situado dentro del predio dominante, y es además susceptible de reparación, a juicio de la Sala sentenciadora.*"

Como se ve, en el caso español, se trataba de una servidumbre legal de carácter privado y el Tribunal Supremo de España lo único que hizo fué aplicar el art. 543 del Código Civil de España (479 nuestro) que dispone que "el dueño del predio dominante podrá hacer a su costo en el predio sirviente *las obras necesarias* para el uso y conservación (reparación) de la servidumbre *pero sin alterarla y hacerla más gravosa*". En este caso no se trata de una servidumbre legal de carácter privado y sí se trata de un predio con acceso a camino público, donde se debate que el camino público no resulta práctico y seguro y que además resulta insuficiente para la explotación industrial del fundo.

Por las razones expuestas, concluimos, que, (1) en el supuesto que el camino vecinal de uso público que existe entre el empalme de la carretera pública y el extremo sureste de la finca del demandante y apelante, fuera práctico y seguro, el mismo no podría utilizarse para la explotación industrial de la finca del demandante y apelante porque entre dicho camino y la parte por donde tendría que explotarse la cantera, hay una montaña de piedra de una altitud de cuatrocientos metros sobre el nivel del mar que hace dicho camino inaccesible al mejor aprovechamiento del fundo que es el fin que persigue la servidumbre predial ordinaria; (2) en el supuesto que el camino vecinal de uso público existente, en su condición actual, no es práctico y seguro, pero podría convertirse mediante reparaciones en un camino práctico y seguro, dichas reparaciones no deben ser sufragadas por el demandante y apelante, ni el demandante y apelante tendría autoridad para proceder a realizarlas, ya que a dicho estado de derecho no le es aplicable el art. 479 del Código Civil de Puerto Rico, que sólo se aplica a servidumbres legales de carácter privado; (3) consideradas las necesidades del predio dominante aisladamente, la vía más práctica y segura y que a su vez resultaría la más suficiente a la explotación industrial del predio dominante, sería la nueva servidumbre solicitada, que comunicaría directamente la boca de la cantera a una carretera pública.

Como cuestión de realidad, a pesar de la existencia del camino de uso público, por las condiciones de dicho camino, la finca de los demandados y apelados es no sólo un fundo incomunicado para cualquiera explotación industrial de su mayor riqueza, sino un fundo improductivo desde hace más de un cuarto de siglo. Como cuestión de hecho probado, la gestión para conseguir la carretera insular que llega hasta la finca de los demandados y apelados pero que le faltan trescientos metros para llegar hasta la finca del demandante y apelante, fué hecha por ambas partes, en el entendido, que

al demandante y apelante se le daría un paso adecuado por la finca de los demandados y apelados, si la nueva carretera no llegaba hasta la heredad del demandante y apelante. Si las nociones del Derecho justo tienen algún sentido en este tiempo, esta servidumbre debe concederse.

*Debe revocarse nuestra anterior sentencia de fecha 14 de mayo de 1951, así como nuestra resolución de fecha 12 de diciembre de 1955, y concederse la servidumbre solicitada por el demandante y apelante, previa tasación de la indemnización correspondiente por el hoy Tribunal Superior de Puerto Rico, Sala de Ponce.*

Los Jueces Asociados Sres. Negrón Fernández y Pérez Pimentel disintieron.